## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

KAREN RUMBLE,

    Plaintiff,

vs.

CONVERGYS,

    Defendant.

Case No. 1:07-cv-979

Judge Herman J. Weber
Magistrate Judge Timothy S. Black

## REPORT AND RECOMMENDATION[1] THAT: (1) DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 18) BE GRANTED; AND (2) THIS CASE BE CLOSED

This civil action is before the Court on Defendant's motion for summary judgment

(Doc. 18) and the parties' responsive memoranda (Docs. 26, 37).

## I.    BACKGROUND

Defendant Convergys Corporation terminated Plaintiff Karen Rumble's

employment as part of an alleged corporate reorganization in October 2005. Plaintiff was

part of the Large Deal Capture Team, a special sales organization responsible for

marketing Convergys' services to its largest customers. Despite the fact that Plaintiff

generated millions of dollars in revenue for Defendant, she was selected for termination

in a reduction-in-force ("RIF").

Plaintiff alleges that her discharge was motivated by age and sex discrimination,

and by retaliation. Additionally, Plaintiff claims that Convergys breached its Sales

---

[1] Attached hereto is a NOTICE to the parties regarding objections to this Report and Recommendation.

Incentive Plan by failing to pay her certain commissions.

Conversely, Defendant alleges that Plaintiff was difficult to manage, dishonest, and generally unwilling to comply with Convergys' expectations of its sales staff. Defendant claims that Plaintiff relies entirely on her subjective impressions about the work environment and her personal disagreement with the company's termination decision, which is insufficient to defeat a motion for summary judgment. Additionally, Defendant maintains that Plaintiff cannot establish a causal relationship between her alleged protected activity and her termination.

## II. UNDISPUTED FACTS [2]

1. Plaintiff Karen Rumble worked for Convergys from July 2003 until October 2005. (Doc. 17 at 11-13, 30-31). She worked as a Sales Director and was primarily responsible for selling Convergys services to the telecommunications industry. (*Id.* at 37-39). Plaintiff was 47 years old when hired, and 49 when she was laid off just two years later. (*Id.* at 8).

2. Plaintiff's early performance evaluations documented poor organizational skills and failure to adhere to Convergys' corporate guidelines. (Doc. 17, Exs. 10, 15).

3. Plaintiff was reassigned to the Large Deal Capture Team in May 2005. (Doc. 17 at 81-82). The team's supervisor was Emil LaCivita, Vice President of Client Business Development. (*Id.* at 74).

---

[2] These are the parties' common undisputed facts taken from Plaintiff's highlighted version of Defendant's proposed findings of fact and conclusions of law. *See* Doc. 31.

4.     In an e-mail to a co-worker, Plaintiff stated that while in Cincinnati at a meeting with Mr. LaCivita, she intended to "cause havoc and kaos [sic]," and she further stated that "I hate working with my new boss [Mr. LaCivita]" and that "he is such a liar." (Doc. 17, Ex. 33).

5.     Mr. LaCivita believed Plaintiff was insubordinate, poorly organized, and dishonest. (Doc. 18, Ex. D at ¶¶ 5-6, 8).

6.     In June 2005, Mr. LaCivita instructed Plaintiff to apply for an AMEX card in accordance with company policy. (Doc. 17, Ex. 18). Mr. LaCivita considered Plaintiff's refusal to apply for the AMEX card insubordination. (Doc. 18, Ex. D. at ¶ 5; Ex. D-1).

7.     In August 2005, Mr. LaCivita and Plaintiff met at the Philadelphia airport. (Doc. 17 at 290). During that meeting, Mr. LaCivita issued Plaintiff a detailed mid-year performance evaluation. (*Id*. Ex. 24). Mr. LaCivita noted Plaintiff's failure to "keep [] schedule commitments, attend [] meetings regularly and on time, communicat[e] openly, effectively and thoroughly, and follow[] policy related to [Travel and Expenses], etc." (*Id.*) According to Mr. LaCivita, Plaintiff's poor performance in these areas, among other things, constituted "a hindrance to Karen's long-term success and reputation within Convergys." (*Id.*)

7.     Mr. LaCivita recommended specific performance improvements that, if followed, would enable Plaintiff "to fulfill the requirements of her job." (*Id.*) He

instructed Plaintiff to keep him apprised of her sales efforts, maintain schedule integrity, improve her time management, and adhere to the corporate travel policies. (*Id.*) Finally, Mr. LaCivita directed Plaintiff to "[m]aintain the highest standards for integrity. Karen will be factual and truthful in all communications with her manager." (*Id.*)

8.    Mr. LaCivita believed that Plaintiff was dishonest about her reasons for missing meetings and confronted her in an October 3 email. (Doc. 17, Ex. 25). He noted that Plaintiff had "indeed missed most 1:1's, and other pre-scheduled meetings in the past 2 months." (*Id.*) Mr. LaCivita again reminded her of the performance improvement obligations established in August and documented numerous examples of her failure to meet these expectations. (*Id.*)

9.    Plaintiff's sales commissions were governed by Convergys' Sales Incentive Plans for years 2004 and 2005. (Doc. 17, Ex. 7 (2004 Plan); Ex. E-1 (2005 Plan); Doc. 17 at 85-88). For purposes of the deals relevant to this litigation, the 2004 and 2005 Plans operate in an identical manner.

10.    These Plans outline the procedure for calculating and paying out sales commissions. When Convergys negotiates a sales contract with a customer, its Finance Department makes an initial estimate of the total contract value ("TCV") and the operating income ("OI") associated with the deal. (*Id.* at Art. 4, Doc. 17 at 98).

11.    Once a contract is signed, the salesperson (or salespeople) involved must submit all required paperwork to the Finance Department. (*Id.* at Art. 3.B). The Finance

Department then uses the estimated TCV and OI associated with the deal to calculate the sales incentive payout, using the tables on pages 6-8 of the Plan. (*Id.* at Art. 3.A, Doc. 17 at 99-101).

12.     The sales incentive is paid out in three stages: 50% at the signing of the contract, 25% at the implementation of the contract, and the remaining 25% twelve months after implementation. (*Id.* at Art. 3.B). This final payment, known as the "true-up," is "subject to adjustment (up or down) to reflect any changes in the total contract value." (*Id.*) The Finance Department then determines the appropriate "true-up" payment due the salesperson. (*Id.*) Under Article 3.B of the Plan, "[f]uture sales incentive payouts may be offset, as necessary, to take into account any downward adjustments." (*Id.*)

13.     In 2004, Plaintiff helped finalize a Convergys deal with BellSouth in the Philippines. (Doc. 17 at 92). After submission of paperwork, the Convergys Finance Department estimated the TCV of the deal at $50M and the OI at 9%, leading to a total estimated sales incentive payout of $180,000. (Doc. 17, Ex. 36). Plaintiff received the first two installments of her incentive payout, a total of $135,000. (Doc. 17 at 92).

14.     Around the same time, Plaintiff sold another Convergys deal to BellSouth, this time in India. Based upon correspondence relating to these claims, Plaintiff believed the TCV of the India contract was $24.5M with an OI of 12%. (Doc. 17 at 101).

15.     Convergys management decided to combine the two BellSouth deals into one deal with combined TCV of $52.9M. (*See* Ex. D-4). The OI was set at 9% – the

-5-

same amount as the initial OI associated with the BellSouth Philippines deal. Applying the matrix factor from the Sales Incentive Plan to this one large deal, Convergys determined that Plaintiff was owed a total of $190,474. (*See* Ex. D-4). Since Plaintiff had already been paid $135,000 at the singing/implementation phase of the Philippines' deal, Plaintiff received an additional $55,474 before leaving Convergys. (Doc. 17 at 103-04).

16.     Plaintiff claims that she contacted Rob Enos, Convergys' Vice President of Human Resources, sometime in September 2005, and complained that Mr. LaCivita was discriminating against her and harassing her on the basis of her gender and her age. (Doc. 17, Ex. 1 at ¶ 7, Doc. 17 at 174-77).

17.     In late 2005, Convergys restructured its Customer Management Group. (*See* Ex. E, Doc. 26, Ex. 2 at ¶ 6). As part of this reorganization, Convergys conducted a RIF, eliminating a number of positions throughout the organization. (*Id.*) Convergys conducted a Critical Skills Assessment ("CSA") in October 2005, with the understanding that the employees who scored lowest probably would lose their jobs in the RIF. (Doc. 17, Ex. 8 (guidelines for CSA); Ex. D-3 (results matrix)).

18.     On October 11, 2005, Emil LaCivita and Jim Boyce conducted a CSA on the members of the Large Deal Capture Team. (Ex. D-3). Members of the team were assigned a numerical ranking in eight categories: job knowledge/technical skills, flexibility, execution, problem solving/decision making, effectiveness, business

skills/acumen, teamwork, and leadership. (Doc. 17, Ex. 8). In addition to these eight

categories, Large Deal Capture Team members were also rated on their progress toward

their sales goals. (*See* Ex. D, Doc. 26, Ex. 4 at ¶ 13; Ex. D-3).

19.     Plaintiff received a score of 10, earning the lowest possible rating in every

category (1 on a scale of 1 to 5) except for sales goal progress, where she received the

second-lowest rating. (Ex. D-3). The other four members of Mr. LaCivita's team

received much higher scores. (*Id.*)

20.     Plaintiff claims that her low scores on the CSA were caused in part by

retaliation for her comments to Rob Enos. However, Mr. Enos played no part whatsoever

in selecting employees for the RIF [nor in establishing CSA scores]. (Ex. F, Doc. 26,

Ex. 3 at ¶ 5).

21.     Convergys informed Plaintiff of its decision and terminated her employment

on October 23, 2005. (Doc. 17, 11-13).

22.     After her termination, Plaintiff filed a charge with the EEOC alleging age

and gender discrimination and retaliation. After the EEOC's dismissal of the charge upon

a no-probable cause finding, Plaintiff filed the instant action. (Doc. 17, Ex. 1 at ¶ 9).

### III.     STANDARD OF REVIEW

A motion for summary judgment should be granted if the evidence submitted to

the Court demonstrates that there is no genuine issue as to any material fact, and that the

movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). *See Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action. *Celotex*, 477 U.S. at 323. All facts and inferences must be construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## IV.  ANALYSIS

### A.  Gender Discrimination

Plaintiff claims that Defendant discriminated against her on the basis of sex in violation of federal and Ohio law.[3]

To make a *prima facie* sex discrimination claim in a reduction-in-force ("RIF") case, the plaintiff must allege sufficient facts showing that: (1) she was a member of a protected class; (2) she was discharged; (3) she was qualified for the position; and (4) "additional, direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for impermissible reasons." *Burns v. Jacor Broad. Corp.,* 128 F.Supp.2d 497, 511-12 (S.D. Ohio 2001).

---

[3] Because the elements of a discrimination case are the same under federal Title VII law and Ohio law, these claims can be considered together. *Graham v. Best Buy Stores*, 298 Fed.Appx. 487, 493 fn.5 (6th Cir. 2008).

Once a plaintiff has made a *prima facie* case, the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the decision. *See McDonnell Douglas v. Green*, 411 U.S. 792, 802 (1973). Under *McDonnell Douglas*, the burden of production may shift from the plaintiff to the defendant, but the burden of persuasion remains with the plaintiff throughout the analysis. *See Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1390 (6th Cir. 1993). If the defendant meets this burden, then the presumption created from the *prima facie* case drops out and plaintiff has "an opportunity to prove . . . that the proffered reasons were not the true reason for the employment decision, but were a pretext for discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 248 (1981). *See also, St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507 (1993); *Brown v. EG&G Mound Applied Technologies*, 117 F. Supp. 2d 671, 677 (S.D. Ohio 2000).

Plaintiff concedes that she has no direct evidence of sex discrimination, and must therefore rely on the indirect burden-shifting framework set forth in *McDonnell Douglas*. She also concedes that her employment was terminated in connection with a RIF, and that she must therefore produce "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled [her] out . . . for discharge for impermissible reasons." *Gragg v. Somerset Technical Coll.*, 373 F.3d 763, 767 (6th Cir. 2004). "The key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence to permit a reasonable jury to conclude that

he or she suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination." *Blair v. Henry Filters*, 505 F.3d 517, 529 (6th Cir. 2007).

### 1. *Prima Facie* Case

There is no dispute that Plaintiff is a member of the protected class, nor that she suffered an adverse action when she was terminated, nor that she was qualified for her position (for even though Defendant disputes Plaintiff's job performance, it does recognize that her "qualifications" should be dealt with at the pretext stage of the analysis). (Doc. 18 at 11, fn 8). Accordingly, the only element of the *prima facie* case analysis in dispute is whether or not Plaintiff has proffered "additional, direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for impermissible reasons," *see Burns v. Jacor Broad. Corp.,* 128 F.Supp.2d 497, 511-12 (S.D. Ohio 2001), *i.e.*, whether there is evidence, albeit disputed, from which reasonable jurors could conclude that Plaintiff's gender was a determining factor in the decision to terminate her employment. In this context, Plaintiff relies on several statements and situations to give rise to an inference of discrimination:

### a. Waiver of the true-up for LaCivita and Schuman's sales

The Sixth Circuit has held that evidence showing the employer favored those outside the protected group is relevant to a claim of discrimination. *See LaGrant v. Gulf & Western Mfg. Co., Inc.,* 748 F.2d 1087, 1091 (6th Cir. 1984). Plaintiff claims that

-10-

there is evidence of a double standard and that Defendant violated the compensation plan

for the benefit of men. When an employer violates a policy or practice, an inference of

discrimination arises. *Barnes, supra* 896 F.2d at 1470 n. 22; *W.F. Bolin Co. v. NLRB*, 70

F.3d 863, 871 (6th Cir. 1995); and *Scales v. U.C. Bradford & Co.*, 925 F.2d 901, 906 (6th

Cir. 1991).

Specifically, Plaintiff claims that with respect to sales commission payouts, the

2004 Compensation Plan required a "true-up" at the end of 12 months. (Doc. 17, Ex. 7 at

2-3). However, there was no-true up performed for the IBM/Sprint and IBM/Nextel deals

("IBM deals") done by Mr. LaCivita and Mr. Schuman in 2004. Mr. LaCivita and Mr.

Schuman were paid 100% of their multiple-hundred thousand-dollar commissions

immediately. (Doc. 26, Ex. 4 at 11-13; Exs. 16, 17 ). There was no hold-back of 25% to

see whether the operating income would remain as anticipated. On the other hand,

Defendant imposed the true-up requirement for Plaintiff's $50M deal with BellSouth in

the Philippines. (Doc. 17 at 93). Plaintiff claims that if she had been given the same

benefit of waiving the true-up, she would have been paid an additional $45,000 in 2004.

Defendant also imposed the true-up on Mary Jo McCool's deal with Singtel Optimus.

(Doc. 32, Ex. 16 at 18-19; Ex. 18 ).

Convergys does not dispute that, ordinarily, 75% of the expected commission on a

sale is paid out at the time that the contract is signed and implemented, and the remaining

25% is withheld for a twelve-month period in case a "true-up" is necessary due to the

-11-

actual performance of the deal. (Doc. 37, Ex. A at ¶ 3). This true-up allows the salesperson's commission to be adjusted if the contract does not meet expectations with respect to operating income. (*Id.*)

With respect to the IBM deals, however, Defendant explains that no true-up was needed because the high dollar value of these two deals subjected the resulting commissions to a "cap." (Doc. 37, Ex. A at ¶¶ 4, 5). Under the Sales Incentive Plan, a salesperson's commission payout is calculated based on the deal's expected operating income and total contract value. (*Id.*) But no matter how large the deal's value, the salesperson's commission payout is subject to a "per deal" payout cap. (*Id.*) For the IBM deals, which were for $300M and $486M, respectively, even if their total contract value decreased somewhat from original expectations, the guaranteed operating income from the two deals was so high that the calculated commission payout vastly exceeded the applicable payout cap. (*Id.* at ¶¶ 6-7). Given this cap, Defendant claims that it did not make sense to withhold any part of Mr. Schumann or Mr. LaCivita's commission payouts as a true-up, and they each received their commission payouts upon implementation of the contract. (*Id.* at ¶ 7).

Although Plaintiff argues that these payouts are evidence of gender discrimination, she cannot point to any similar deal that was not paid out in the same manner. The IBM deals are not comparable to Plaintiff's $50M BellSouth deal or Ms. McCool's $57M Singtel Optimus deal, because they did not trigger the "cap" like the IBM deals did.

-12-

Accordingly, Convergys' payouts to Mr. Schuman and Mr. LaCivita cannot serve as evidence of gender discrimination.

### b. Reduction in McCool's bonus

Plaintiff also claims that Defendant favored men when they had help on deals. For example, Mr. LaCivita and Mr. Schuman worked together on the IBM deals, but they did not suffer any reduction in their commissions for the "help" they provided to each other. (Doc. 26, Ex. 4; Exs. 16, 17). Conversely, Mr. LaCivita denigrated Ms. McCool's role in her $57M dollar deal with Singtel Optimus, and her commission was reduced by 50%, or $150,000, as a result. (*Id.*, Exs. 18, 19, 20).

However, as previously explained, these deals cannot be compared. Although Mr. LaCivita and Mr. Schuman worked together on their respective deals, they still produced two sales for Convergys, each totaling hundreds of millions of dollars. (Doc. 37, Ex. A at ¶¶ 6-7). Ms. McCool received help to achieve only one sale of $57M. These circumstances are readily distinguishable, and, therefore, these facts cannot give rise to an inference of discrimination.

### c. Hiener's bonus

Additionally, Plaintiff claims that the fact that Mr. LaCivita gave a $75,000 "discretionary" bonus to Brian Hiener for his support work on a deal with General Motors is evidence of discrimination. (Doc. 26, Ex.4 at 24-25; Ex. 2 at Ex. 16). Plaintiff argues

-13-

that Mr. Hiener received more for his assistance with the GM deal than Plaintiff did for selling and putting together the BellSouth India deal which was expected to generate over $24M in revenue for Defendant. However, as Plaintiff concedes, Mr. Hiener was not a salesperson, subject to the sales compensation plan. (Doc. 26, Ex. 4 at 28-29; Ex. 2 at 50-52). Therefore, any comparison between Mr. Hiener's compensation and Plaintiff's is improper because they are not similarly situated. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).

### d. Remarks evidencing sex discrimination

Plaintiff alleges that through his words and actions, Mr. LaCivita conveyed that he did not respect or value women. In *LaGrant, supra,* the court noted that evidence showing that an employer held the protected class in "disfavor" is also relevant to the plaintiff's *prima facie* case. 748 F.2d at 1091. Specifically, Plaintiff heard Mr. LaCivita and Mr. Schuman make jokes about Ms. Timmins. (Doc. 17 at 158). For example, they made fun of "spa stuff and sort of this general viewpoint about fluffy women kind of thing." (*Id.*). Additionally, Mr. LaCivita allegedly made reference to the fact that Ms. McCool had several children and that that was her other "full time job." (*Id.* at 172).[4]

---

[4] Defendant claims that such comments are insufficient to reflect animus against women that rises to the level of actionable discrimination. However, the cases Defendant cites to support this proposition are inapplicable because they both concern situations where the Plaintiff was attempting to use the comments to establish *direct evidence* of discrimination. *See, e.g., Creech v. The Ohio Cas. Ins. Co.*, 944 F.Supp. 1347, 1358 (S.D. Ohio 1996) (holding that a supervisor's comment that the plaintiff "could go home and watch soap operas" does not display *direct* evidence of animus toward women); *Fuller v. GTE Corp.*, 926 F.Supp. 653, 657 (M.D. Tenn. 1996) (holding that a manager's negative comments about alleged comments about plaintiff's child care responsibilities does not reflect *direct* evidence of a gender bias).

Plaintiff also claims that Mr. LaCivita chaffed at reporting to Ms. Timmins, a female for whom he had very little respect (Doc. 17 at 165), and that Mr. LaCivita described his relationship with Ms. McCool only as "okay" (Doc. 26, Ex. 4 at 123), and that Ms. McCool found working with Mr. LaCivita to be "difficult" (Doc. 17 at 78).

Additionally, Plaintiff claims that Mr. LaCivita unnecessarily criticized her. For example, Mr. LaCivita allegedly implied that Plaintiff was not worth the commission she earned on the BellSouth Philippines deal. (Doc. 17 at 160). In contrast, Plaintiff claims that she never heard Mr. LaCivita make negative comments about her male co-workers, Eric Schuman or Jay Halstead. (*Id*. at 165).

However, a plaintiff's opinion that a supervisor is friendlier with and less critical of male employees does not evidence sex discrimination. *See, e.g., Wienke v. Haworth, Inc.*, 1993 U.S. App. LEXIS 854, at *9-10 (6th Cir. Jan. 11, 1993) (holding that witnesses' subjective impressions that their supervisor "regularly treated women more harshly and critically than men, lied, and did not like 'confident women'" do not create a triable issue of fact); *Taylor v. The Union Inst.*, 30 Fed. Appx. 443, 450-51 (6th Cir. 2002) ("[G]eneralized allegations about the comparative warmth with which a few individuals treat non-minorities are not sufficient to raise a genuine issue of fact regarding [defendant's] discriminatory intent.").

Moreover, even if Mr. LaCivita disliked Plaintiff, Ms. McCool, or Ms. Timmins, and got along better with the male employees, this fact is not cognizable, because

-15-

"[p]ersonal conflict does not equate with discriminatory animus." *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 791 (6th Cir. 2000). *See also Chappell v. GTE Products Corp.*, 803 F.2d 261, 268 (6th Cir. 1986) (holding that personal beliefs, conjecture and speculation are insufficient to support an inference of discrimination).

In addition, Plaintiff claims that Defendant's reaction to her concerns about discrimination was fully consistent with the notion that women were disfavored. For example, when Plaintiff raised concerns about Mr. LaCivita to men, they defended him. When Plaintiff told Mr. Boyce that Mr. LaCivita did not like women, rather than wanting to hear more, Mr. Boyce simply told Plaintiff she needed to "go along and get along." (Doc. 26 at 23). Although Mr. Boyce acknowledged that when someone complains about discrimination, it is "a very serious matter," and that he would go to HR immediately, there is no evidence that he did anything to address Plaintiff's concerns. (Doc. 26, Ex. 2 at 81-82).

Plaintiff also claims that when she escalated her complaints to Rob Enos, the Vice President of Human Resources, he was hostile and defensive. Plaintiff maintains that Mr. Enos was under the erroneous impression that Plaintiff had problems with all of her supervisors (Doc. 17 at 177), despite the fact that in her most recent evaluation in February 2005, Ms. Timmins noted that she and Plaintiff had "a very solid trusting relationship." (Doc. 17, Ex. 15). In addition, Mr. Boyce had allegedly complimented Plaintiff earlier in 2005 and asked her to help train other Convergys sales people. (Doc. 26 at 23).

-16-

### e. The Critical Skills Assessment

Plaintiff claims that the October 10, 2005 Critical Skills Assessment ("CSA") provides additional evidence of gender bias. Plaintiff and Ms. McCool made large deals for Convergys in 2004. Plaintiff closed another deal in March of 2005. Her production between BellSouth and AT&T ECAM was $78M and she successfully managed the Cingular account. During the same period, Mr. Halstead produced about $34M in revenue – half of Plaintiff's total. In 2004, Plaintiff and Ms. McCool received higher performance ratings than all of the men on the Large Deal Capture Team. However, Mr. Boyce and Mr. LaCivita gave Plaintiff and Ms. McCool, the two females, the lowest ratings.

In *Skalka v. Fernald Env. Rest. Mgt. Corp.*, 178 F.3d 414 (6th Cir 1999), the court noted that the additional evidence required in a RIF case may include "showing that persons outside the protected class were retained in the same position." *Id.* at 420-21, (citing *EEOC v. Clay Printing Co.*, 955 F.2d 936, 941 (4th Cir. 1992)). While the titles of the members of the Large Deal Capture Team varied from "Sales Director" to "Senior Sales Director," the jobs were basically the same. (Doc. 26, Ex. 4 at 17-18). None of the men on the Large Deal Capture Team were terminated. (*Id.*, Ex. 2 at 101, 102). In fact, there is no evidence that any of them were adversely affected by the reorganization.

In *Barnes*, the court noted that an employee in a RIF case "could establish a *prima facie* case by showing that he or she possessed qualifications superior to those of a

younger coworker working in the same position as the plaintiff. Alternatively, a plaintiff could show that the employer made statements indicative of a discriminatory motive as in *Laugesen*, 510 F.2d at 313." *Barnes v. GenCorp, Inc.*, 896 F.2d 1457 1466 (6th Cir. 1990). In the context of gender discrimination, Plaintiff has presented evidence, albeit disputed, of both. That is, jurors could find that Plaintiff's performance was superior to Mr. Halstead's, and jurors could find that Mr. LaCivita's gender-based statements about Ms. McCool and Ms. Timmins are indicative of a discriminatory motive.

Although Defendant asserts that each piece of evidence, in and of itself, does not create an inference of discrimination (*see* Doc. 18 at 13-16), the Sixth Circuit has rejected this approach. In *Thurman v. Yellow Freight*, 90 F.3d 1160 (6th Cir. 1996), the court noted: "Yellow Freight points to each distinct piece of evidence and argues that that evidence does not mandate an inference or a finding of discrimination. This analysis is improper, however, as it was the trial court's duty to review all of the facts together, not in isolation." *Id*. at 1166.

Although much of Plaintiff's evidence of gender bias is refuted by the record evidence and case law, reasonable persons, viewing all of the above evidence, could still find that Defendant singled out Plaintiff because she was a women. And a reasonable person could find that Mr. LaCivita's bias was exhibited by the way he spoke to and about women and in the way he rated Plaintiff and Ms. McCool in the CSA. Considering all of the above evidence in a light most favorable to Plaintiff, she has presented a *prima facie* case of gender discrimination.

-18-

## 2.    Defendant's non-discriminatory reason for termination

As Plaintiff has satisfied her burden of demonstrating a *prima facie* case of gender discrimination, the burden now shifts to Defendant "to articulate a legitimate, non-discriminatory reason for the employee's rejection." *Burdine,* 450 U.S. at 253. To meet its burden, Defendant "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision has not been motivated by discriminatory animus." *Id.* at 257.

As acknowledged in Plaintiff's complaint and in her deposition testimony, Convergys terminated her employment in Fall 2005 as part of a reorganization. (Doc. 17 at 24-25; Doc. 1 at ¶ 8). A RIF is a legitimate, nondiscriminatory reason for termination. *See, e.g., Conley v. U.S. Bank Nat. Ass'n*, 211 Fed. Appx. 402 (6th Cir. 2006); *see also Hatcher v. Gen. Elec.*, No. 98-6304, 2000 U.S. App. LEXIS 2837 (6th Cir. Feb. 22, 2000) (contention that plaintiff was selected for termination in RIF because he obtained the lowest score on a skill assessment matrix constituted legitimate nondiscriminatory reason for termination). Defendant evidences that it selected Plaintiff for termination in the RIF because she was ranked as the weakest member of the Large Deal Capture Team as measured by the CSA. (Doc. 17, Ex. 8; Ex. D-3; Ex. E, Doc. 37, Ex. A at ¶ 8).

Accordingly, the burden reverts back to the Plaintiff to establish pretext.

## 3.    Whether the RIF was pretext for discriminatory animus

In order to establish pretext, Plaintiff must demonstrate that the reasons given by

Convergys for her discharge: (i) had no basis in fact, or (ii) did not actually motivate the decision, or (iii) were not sufficient to warrant the action taken. *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078, 1083 (6th Cir. 1994). A *prima facie* case plus a showing that Defendant's articulated reason is false is sufficient for Plaintiff to prevail. *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509-510 (1993); *Kline v. Tennessee Valley Auth.*, 128 F.3d 337, 347 (6th Cir. 1997).

First, Plaintiff claims that while there may have been a "reorganization," there is a dispute about whether it resulted in a RIF in Plaintiff's department. While Plaintiff acknowledges that her job was eliminated at the time of her termination, she alleges that within less than three months, Defendant posted a Sales Director position in the Customer Management Group reporting to Mr. LaCivita. (Doc. 26, Ex. 2 -- Ex.10). Plaintiff maintains that jurors could certainly question the credibility of this "one-person" "RIF," when it was followed shortly thereafter by the posting of a position with the same title in the same organization from which Plaintiff was dismissed.

However, in response to Plaintiff's *argument*, Defendant presents *evidence* that the January 2006 posting of a vacancy was the result of a transfer and resignation of two employees who worked in the western United States and who were responsible for high tech customers on the west coast. (Doc. 37, Ex. A at ¶ 9; Doc. 26, Ex. 4 at 127). And the law is clear that Convergys' decision not to retain her until the position became available is not evidence of discrimination. *See Bender v. Hecht's Dep't Stores*, 455 F.3d 612, 622

(6th Cir. 2006) ("A company is not obligated to retain an employee otherwise subject to a workforce reduction because it expects to have an opening in the not-too-distant, but not immediate, future"). Therefore, the fact that another sales position became available three months after the RIF does not negate the indisputable evidence that Plaintiff's position was eliminated in conjunction with a legitimate RIF.

Additionally, the record reflects that Plaintiff's termination was part of a downsizing that affected many other employees. (Doc. 37, Ex. B). Convergys laid off 24 employees (including Plaintiff) in October 2005, with 25 more laid off in the following three months. (*Id*. at ¶ 3). Fifteen of the 24, including Plaintiff, were part of the sales organization. (*Id*.) Nine of the 15 sales employees were male. (*Id*.) This evidence entirely negates Plaintiff's mere argument that Plaintiff was terminated as part of a "one-person" RIF.

Plaintiff also argues that even if her position on the LDCT team was legitimately eliminated, the fact that Convergys did not transfer her to another position within the Company is evidence of discrimination. The Sixth Circuit rejected a similar argument in *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365 (6th Cir. 1999). "[A]n employer has no duty to transfer an employee to another position within the company when the employer reduces the workforce for economic reasons." *Id*. at 374. Accordingly, the indisputable evidence demonstrates that elimination of Plaintiff's position was part of a legitimate, company-wide RIF, and her pretext argument is not viable.

Even if there was a legitimate reorganization and reduction, Plaintiff argues further that the RIF does not explain why she was terminated. However, the evidence establishes the indisputable fact that Plaintiff was eliminated because she was ranked last in the CSA rankings.

The record is replete with evidence that Plaintiff consistently failed to meet internal deadlines, comply with corporate policy, communicate with her supervisor and teammates, and cooperate with her supervisor's requests, which was what led directly to her low rankings on each of the categories measured by the CSA. (Doc. 17, Ex. 8). In fact, Plaintiff does not dispute her shortcomings in these areas. Her own deposition testimony confirms that she was difficult to manage, and year after year, her performance evaluations under multiple supervisors noted consistent problems in these areas. (Doc. 17 at 53, 80, Exs. 10, 15, 24). Additionally, Plaintiff freely acknowledges her disregard for certain job duties, which she dismisses as "paperwork," and "internal process issues." (Doc. 26 at 31). *Coulter v. Deloitte Consulting*, 79 Fed. Appx. 864m 868 (6th Cir. 2003) ("[I]t is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance."); *Gerth v. Sears, Roebuck & Co.*, No. 94-6664, 1996 U.S. App. LEXIS 22577, at *17-18 (6th Cir. Aug. 14, 1996) ("[J]ust because Gerth received good evaluations in other spheres of his work responsibilities does not overcome his repeated failures to meet his maintenance agreement percentage."). Rather than refute the evidence revealing her indifference and

insubordination, Plaintiff simply argues that these failures were just part of her "independent," "autonomous," and "aggressive" personality, and, in her view, all that really should have mattered was that she was generating sales. (Doc. 26 at 31-32).

Other than her own self-serving assessment of her performance, the only evidence Plaintiff offers to discredit the evidence supporting the CSA rankings is that she received favorable evaluations and recognition for her work in 2004, when she reported to a different supervisor. However, these other supervisors shared the same concerns that Mr. LaCivita had with respect to Plaintiff's work performance. (Doc. 17, Exs. 10, 15). Moreover, even if other prior supervisors regarded Plaintiff more favorably than Mr. LaCivita, this evidence is not properly relevant. "It is simply stating the obvious to observe that what may have satisfied one management regime does not necessarily satisfy its successor, and Plaintiff's proffered evidence does not serve to rebut current management's views regarding plaintiff's insufficient skills to continue performing in his former position." *Weller v. Titanium Metals Corp.*, 361 F.Supp. 2d 712, 722 (S.D. Ohio 2005) (quoting *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 474 (6th Cir. 2002)).

Furthermore, the Sixth Circuit has adopted an "honest belief" rule with regard to an employer's proffered reason for discharging an employee. *Smith v. Chrysler Corp.*, 155 F.3d 799, 806-07 (6th Cir. 1998). "Under this rule, as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately

-23-

shown to be incorrect." *Majewski v. Auto. Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). An employer has an honest belief in its reason for discharging the employee "where the employer reasonably relied on the particularized facts that were before it at the time the decision was made." *Id.*

Although Plaintiff claims that the Sixth Circuit eliminated its deference to the employer's business judgment in *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564 (6th Cir. 2003), Plaintiff's analysis is incorrect. While the court in *Wexler* observed that an employer's business judgment is not an "absolute defense" to a claim of discrimination, the court did not hold that disagreement (or even reasonable disagreement) with the employer's decision is enough to establish pretext. Rather, to attack Convergys' business judgment, Plaintiff must produce evidence that could support a finding that the employer's decision was unreasonable, or, "so ridden with error that defendant could not honestly have relied upon it." *Id*. at 576 (quoting *In re Lewis*, 845 F.2d 624, 633 (6th Cir. 1988)). In light of the undisputed evidence demonstrating Plaintiff's attitude toward her supervisors' priorities and instructions, Plaintiff fails to present evidence that Convergys' elimination of her position was anything but a reasonable exercise of business judgment.

Accordingly, Plaintiff is unsuccessful in proffering pretext because she has failed to present evidence that Defendant's articulated reason for her termination was false.

**B.     Age Discrimination**

Although Plaintiff's complaint contained claims of age discrimination in violation of the ADEA and Ohio Rev. Code § 4112 (Doc. 1 at ¶ 11), her memorandum in opposition is completely silent with respect to these claims. Accordingly, because Plaintiff has not presented evidence or argument to support her claims of age discrimination, Count II should be dismissed as a matter of law. *Bradley v. Mary Rutan Hosp. Assoc.*, 322 F.Supp.2d 926, 931 n. 7 (S.D. Ohio 2004) (summary judgment is appropriate where plaintiff offered no response to arguments raised in defendant's motion).

**C.     Retaliation Claim**

In addition to her Title VII claims of sex discrimination, Plaintiff also alleges that Defendant unlawfully retaliated against her for her complaints to Rob Enos, Covergys' Vice President of Human Resources, that Mr. LaCivita was discriminating and harassing her on the basis of her gender and her age.[5]

Title VII prohibits an employer from discriminating against any employee "because he has opposed any practice made 'an unlawful practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an

---

[5]  Plaintiff asserts retaliation in violation of 42 U.S.C. § 2000e-3 and Ohio Rev. Code § 4112.02(l). Because federal and state law retaliation claims are governed by the same standards, the claims will be considered together. *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 541-42 (6th Cir. 2003).

investigation, proceeding, or hearing under [Title VII].'" 42 U.S.C. § 2000e-3(a).

To recover for retaliatory discharge, a plaintiff must show that: "(1) she engaged in an activity protected by Title VII; (2) this exercise of her protected civil rights was known to defendant; (3) defendant thereafter took an employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." *Canitia v. Yellow Freight Sys., Inc.*, 903 F.2d 1064, 1066 (6th Cir. 1990) (citing *Wrenn v. Gould*, 808 F.2d 493, 501 (6th Cir. 1987)). All four elements must be established in order to make out a *prima facie* case. *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 831-32 (6th Cir. 1999).

The *McDonnell Douglas* and *Burdine* burden-shifting paradigms applicable in disparate treatment discrimination and RIF cases are also applicable to retaliation claims. *See Zanders v. Nat'l R.R. Passenger Corp.*, 898 F.2d 1127, 1134-35 (6th Cir. 1990) (finding that in order to establish a causal connection, the plaintiff is required to "proffer evidence 'sufficient to raise the inference that her protected activity was the likely reason for the adverse action'").

Plaintiff's success on her retaliation claim does not depend on the merits of the underlying discrimination claim. *See Powell v. Morris*, 37 F. Supp. 2d 1011, 1016 (S.D. Ohio 1999); *Spence v. Local 1250, UAW*, 595 F. Supp. 6, 10 (N.D. Ohio 1984) ("An employee need not establish the validity of his original discrimination claim in order to prove a charge of employer retaliation flowing from the original claim . . . the factual

truth of the employee's accusation which inspired the reprisal is immaterial . . . what is relevant is that the employee sincerely believed discriminatory practices existed."). "Thus, the employee need not establish that the alleged conduct she opposed was in fact discriminatory, so long as she can demonstrate that she had a good faith, reasonable belief that the conduct about which she complained was in violation of Title VII." *Black v. Columbus Public Schools*, 124 F. Supp. 2d 550 (S.D. Ohio 2000).

### 1. *Prima Facie* Case

#### a. Whether Plaintiff's complaints are protected activity

Plaintiff argues that, in addition to complaining to Mr. Enos,[6] she also made similar complaints about Mr. LaCivita to Mr. Boyce.

However, Plaintiff's deposition testimony indicates that her conversation with Mr. Boyce did not constitute a complaint of unlawful discrimination or other protected activity:

> Q. Okay. Jim knew of your issues with Emil, but in the few weeks prior to your phone conversation with Rob Enos when you talked to Jim about the situation with - with Emil, you didn't mention age discrimination or sex discrimination in the conversation with Jim, did you?
>
> A. Not in those terms. I wouldn't have used those terms.

---

[6] In his deposition, Mr. Enos denied that Plaintiff complained about gender discrimination or harassment. (Doc. 18, Ex. F). For purposes of this motion, however, the Court must acknowledge that Plaintiff has raised a disputed issue of fact as to whether or not she complained about discrimination to Mr. Enos.

Q.   Did you say anything that would - that you thought fairly signaled to him that you thought that Emil -

A.   I told him that I didn't think Emil liked me and I didn't think he liked women. That's what I said.

(Doc. 17 at 182-83).

However, Plaintiff's comment to Mr. Boyce that "I don't think Emil likes me and I don't think he likes women" is not protected activity. *See Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304 (6th Cir. 1989) ("[W]e hold that a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice."). In *Booker*, the plaintiff filed a complaint with human resources, suggesting that his supervisor was a racist, and that complaints about his performance were "ethnocism." *Id.* at 1309. The district court concluded that this was not protected activity, and the Sixth Circuit affirmed. *Id.* at 1313. ("Booker suggests that Pavona may be a racist due to a statement he allegedly made. However, the allegation is not that Brown & Williamson is engaging in unlawful employment practice, but that one of its employees has a racial intolerance"). Therefore, even if Plaintiff complained to Mr. Boyce that she and Mr. LaCivita were not getting along because "he doesn't like women," this complaint does not constitute protected opposition to unlawful activity, and it cannot serve as the basis for a claim of retaliation.

### b. Whether Mr. Boyce and Mr. LaCivita were aware that Plaintiff engaged in protected activity

As set forth in the complaint and her deposition testimony, Plaintiff claims that she

contacted Rob Enos, Convergys' Vice Present of Human Resources, sometime in September 2005. (Doc. 17, 174-75; Ex. 1 at ¶ 7). She claims the two of them had a telephone conversation pertaining to her strained relationship with Mr. LaCivita. (*Id*. at 175, 177). During this conversation, Plaintiff claims that she complained to Mr. Enos that Mr. LaCivita was discriminating against her and harassing her on the basis of her gender and age. (*Id*. at 177). The only three Convergys representatives involved in the CSA were Mr. Boyce, Mr. LaCivita, and Mr. Utecht. (Doc. 18, Ex. D-3). Plaintiff admits that she has "no documented evidence" that Mr. Enos shared her complaints with anyone involved in the CSA. (*Id*. at 187). However, Plaintiff testified that she "believed" Mr. Enos spoke with Mr. Boyce based on her subjective beliefs, these beliefs being generated because her coworkers and mangers were more "guarded" and "politically correct" after her conversation with Mr. Enos. (*Id.* at 187-88). She also refers to changes in "behavior and attitude" by Mr. Timmins and Mr. Boyce. (*Id*. at 188).

In order to establish that Mr. Boyce and Mr. LaCivita were aware that Mr. Enos shared her complaints with individuals involved in the CSA, Plaintiff claims that "things changed." Specifically, Plaintiff alleges that "there was no talk of transfer or an attempt by Defendant to find another position for Plaintiff" and she was not made to feel "like she was wanted." (Doc. 26, Ex. 2 at 103; Ex. 4 at 128). However, the failure to transfer an employee who is subjected to a RIF is not evidence of an improper motive (*Godfredson*, 173 F.3d at 374), and this speculation is insufficient to support Plaintiff's belief that

-29-

Mr. Boyce knew about her complaints to Mr. Enos. *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002) (affirming summary judgment for the defendant because "the inferences plaintiff sought to draw from evidence were akin to ... speculations, hunches, [or] intuitions ....").

In *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000), the Sixth Circuit held that in order to establish the causal connection required for a *prima facie* Title VII case of retaliation, "a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken" had the plaintiff not engaged in protected activity. Additionally, e-mail correspondence between Mr. LaCivita and his supervisor indicates that he was exasperated with Plaintiff's intransigence and uncooperativeness as early as July. (Doc. 17, Ex. 21). This is not a case where the boss's criticisms began only after protected activity.

### c. Whether there was a causal connection between Plaintiff's complaints and her discharge

To demonstrate a causal connection, Plaintiff must only produce evidence "sufficient to raise the inference that [her] protected activity was the likely reason for the adverse action." *Zanders*, 898 F.2d at 1135. "[A]t the *prima facie* stage the burden is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity." *EEOC v. Avery Dennison Corp.*, 104 F.3d 858 (6th Cir. 1997). In seeking to suggest this causal connection,

Plaintiff raises three arguments:

First, Plaintiff claims that it is generally accepted that an adverse action taken shortly after an employee engages in protected conduct supports an inference of retaliation. *See Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516 (6th Cir. 2008); *DiCarlo v. Potter*, 358 F.3d 408, 421. Here, Plaintiff was terminated within approximately one month from the time she complained to Mr. Enos. However, the Sixth Circuit has held that "temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence." *Arendale v. City of Memphis*, 519 F.3d 587, 606 (6th Cir. 2008) (rejecting the plaintiff's claim that a two-month proximity between an EEOC charge and an alleged adverse employment action constituted sufficient evidence of causation).[7]

Second, Plaintiff claims that the CSA ratings are tinged with retaliation. Plaintiff alleges that despite her success and production, she was rated lower than every member of the Large Deal Capture Team in all but one category. Despite the fact that she generated twice as much revenue in 2004 and 2005 as Mr. Halstead, she was given a "1", the lowest rating in the group.

---

[7] Additionally, the cases cited by Plaintiff can be distinguished from the facts of the instant case. In *Mickey*, the employer discharged the employee the very same day that it learned of the employee's EEOC charge. *Id*. at 531. In *DiCarlo*, the plaintiff's supervisor recommended the plaintiff's discharge just eleven days after he learned that plaintiff filed a charge. *Id*. at 421-22. In *Polk v. Yellow Freight Systems*, 876 F.2d 527, 531 (6th Cir. 1987), the employer discharged the plaintiff the day after she visited the MDCR. *Id*. at 531. In the instant case, the decision to terminate Plaintiff came at least one month after her alleged complaints to Mr. Enos.

Third, Plaintiff maintains that Mr. Boyce's attempt to extend the term of Plaintiff's non-compete restriction after she requested a waiver could be viewed as evidence of his retaliatory animus extending beyond Plaintiff's dismissal.

However, even if the Court were to find that Plaintiff met her burden of establishing an inference of causation, the undersigned finds that she has failed to establish a *prima facie* case of retaliation because she has failed to offer any evidence that the individuals involved in her termination *knew* about her complaints. Moreover, even if she established a *prima facie* case, her retaliation claim still fails as a matter of law because she cannot offer evidence that Defendant's legitimate, non-retaliatory reason for terminating her was pretext from some illegal motive. As summarized in Section IV.A.3, Plaintiff fails to present evidence that her selection for termination in the RIF was a mere pretext for discrimination.

## D.    Breach of Contract

Finally, Plaintiff alleges that Convergys breached its Sales Incentive Plan for 2004 and 2005 (Doc. 17, Ex. 7, Ex. E-1) by failing to compensate her fully for three deals she helped close during her employment. (Doc. 17 at 91-92). As identified in her deposition, these deals are: (1) AT&T ECAM; (2) BellSouth Philippines; and (3) BellSouth India. (Doc. 17 at 92, 101, 108). Plaintiff asserts that the compensation agreements amounted to a contract with Convergys, which Convergys breached.

The essential elements of a cause of action for breach of contract are: (1) the existence of an enforceable contract; (2) the performance (or excuse from performance) of the contractual obligations by the party seeking relief; (3) breach or failure to fulfill contractual obligations by the other party; and (4) damages suffered by the party seeking relief as a result of the breach. *Spectrum Benefit Options, Inc. v. Med. Mut. of Ohio*, 880 N.E.2d 926, 934 (Ohio App. 2007).

Defendant argues that Plaintiff's breach of contract claim fails for two reasons: (1) the Sales Incentive Plans are not enforceable contracts; and (2) even if the Sales Incentive Plans are enforceable contracts, Plaintiff cannot demonstrate that Convergys failed to fulfill its contractual obligations.

Under the Sales Incentive Plans for 2004 and 2005, Convergys retains discretion over the payment of commission. As described in the Plan, sales incentive payouts are calculated using the estimated total contract value ("TCV") and operating income ("OI") associated with a particular deal. (*See* Doc. 18, Ex. 7; E-1 at Art. 3). However, the Plan specifies that the determination of these figures is left to the exclusive discretion of the Senior Vice President of Finance, Customer Management Group. (*Id*. at Art. 4).[8] Furthermore, the calculation of a contract's actual performance, for use at the "true-up" stage, is left to Convergys' Finance Department. (*Id*. at Art.3.B). The Agreement does

---

[8] "Revenue objectives are set annually and may be modified during the plan year at management discretion. . . . The Company makes the final determination regarding revenue recognized." (*Id*. at Art. 4, 5).

not provide salespeople with any recourse for challenging the calculation of an incentive payout and explicitly contemplates the possibility of deviation from the terms of the Plan in unforseen circumstances. (*Id.* at Art.5.B).[9]  Finally, Convergys retains the right to amend or cancel the Plan at any time. (*Id.* at Art.5.A).[10]

In *Kulas v. Bank One Trust Co.*, No. 01AP-1290, 2002 Ohio App. LEXIS 4966 (Franklin Cty. Sept. 19, 2002), the court held that a similar incentive compensation program constituted an unenforceable illusory contract.  Like the Sales Incentive Plan, the commission program invalidated in *Kulas* gave the company unfettered discretion over the calculation, approval, and distribution of incentives.  Also, like the Convergys plan, the employer retained the right to "terminate, amend or modify" at any time and "the existence of the plan [did] not obligate the . . . company to pay an award to any participant." *Id.* at 4.  Analogous to the instant case, the plaintiff in *Kulas* alleged that his employer breached the terms of the incentive plan by failing to pay him commission he allegedly earned under the plan. *Id.*  The court dismissed the plaintiff's breach of contract claim, holding that the language contained in the plan "rendered the contract illusory." *Id.* at 16. *See also Meyer v. AmerisourceBergen Drug Corp.*, 264 Fed. Appx. 470, 475

---

[9] "No payouts shall be made for situations that are not clearly addressed by the Plan . . . Recognizing that no plan can cover all possible situations and that discrepancies, unusual situations, and errors can occur, it is recommended that you discuss such issues immediately with your manager so that they can be resolved promptly." (*Id.*)

[10] "Convergys reserves the right to amend and/or terminate this Plan at any time with respect to sales contracts and/or work orders signed after the date of such amendment." (*Id.*)

-34-

(6th Cir. 2008) (holding that plaintiff was not entitled to incentive compensation under the employment agreement where the agreement provided the employer unfettered discretion regarding whether or not to award plaintiff incentive compensation).

Similarly, the Sales Incentive Plan does not create a mutual contractual obligation between the parties because Convergys retains the unrestrained discretion to amend, cancel, and alter the effect of the Incentive Plan. (Doc. 18, Ex. 7; E-1 at Art. 3.B, 4, 5.A, 5.B). Without mutuality of obligation there is not an enforceable contract. Under Ohio law, which governs the Agreement, this discretion renders the incentive compensation illusory and unenforceable. *Imbrogno v. MIMRx.com, Inc.*, No. 03AP-345, 2003 Ohio App. LEXIS 5459 (Ohio App. Nov. 18, 2003). As the Ohio courts have explained, "[a]n apparent promise which according to its terms makes performance optional with the promisor . . . is in fact no promise, although it is often called an illusory promise." *Id.* at 6. "If a promise is illusory, of course, then the contract is not enforceable." *Id.*

Plaintiff argues that a clause in the Plan stating that Convergys may not amend or terminate the Plan "with respect to sales contract and/or work orders signed after the date of amendment" restrains Convergys' right to determine the nature of its extent or performance and is therefore sufficient to demonstrate mutual obligation. (Doc. 26 at 34). This contention lacks merit. Even after a contract is signed, Convergys retains unfettered discretion to determine the extent of its performance. For example, the determination of a contract's TCV, OI, and actual performance are all left to the

-35-

company's discretion. (Doc. 17, Ex. 7; Ex. E-1 at Art. 4 and Art.3.B). Additionally, the Plan explicitly contemplates the possibility of deviation from the terms of the Plan in unforeseen circumstances. (*Id*. at Art. 5.B).[11]

Accordingly, by the express terms of the Sales Incentive Plan, it did not constitute an enforceable contract and Plaintiff's claim fails as a matter of law.

## IV. CONCLUSION

Based on the evidence of record, the undersigned finds that there are no genuine issues of material fact for trial, and that Defendant is entitled to judgment as a matter of law on all counts of the complaint. It is therefore **RECOMMENDED** that Defendant's motion for summary judgment (Doc. 18) be **GRANTED**, and that this case be **CLOSED**.

Date: 11/9/09

s/ Timothy S. Black
Timothy S. Black
United States Magistrate Judge

---

[11] Plaintiff also alleges that the terms of the Sales Incentive Plan constitute a breach of the implied covenant of good faith and fair dealing. (Doc. 26 at 34). However, Convergys never entered into a contractual relationship, and even if it did, Convergys' exercise of its rights under the express written terms of an agreement is not a breach of any duty of good faith and fair dealing.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

KAREN RUMBLE,                          :        Case No. 1:07-cv-979
                                       :
            Plaintiff,                 :        Judge Herman J. Weber
                                       :        Magistrate Judge Timothy S. Black
     vs.                               :
                                       :
CONVERGYS,                             :
            Defendant.                 :

## NOTICE

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report & Recommendation ("R&R") within **TEN DAYS** of the filing date of this R&R. That period may be extended further by the Court on timely motion by either side for an extension of time. All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections. A party shall respond to an opponent's objections within **TEN DAYS** after being served with a copy of those objections. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981).